# EXHIBIT "1"





August 8, 2002

Ed Bennett
PBM Construction Group
1300 MacDade Blvd., St. B
Folsom, PA 19003

RE:    Veterans Hospital
         Delays

Ed,

In accordance with our previous written and verbal notifications, the lack of timely answers to our RFI's, delays and lack of approval of submittals, and lack of direction to the numerous change requests have delayed our work.  These delays have caused us to perform out of sequence work, to downsize our workforce, demobilize and remobilize. The delays have caused us to lose anticipated profit and overhead, severely increased the difficulty of completing the work of this contract and required additional time for us to complete our work.

<u>Out of Sequence Work</u>

Based on the delays to date we estimate that we will spend 5386 hours on this project. We have exceeded our adjusted estimate by 2,534 hours.

The disruptions and suspension to the planned schedule of work have caused the additional labor costs.  This project had several constraints.  The building was occupied and in use.  Tie-ins to existing work had to be done to avoid loss of services to the patients.  The scheduled completion date was tight.  Our work was to be closely coordinated in sequence with other trades.  The delays forced the work into disarray.

As outlined numerous times we have been delayed on this project.  We have experienced critical delays in responses to RFI's, submittals, change order requests and field directions. The lack of timely complete answers forced us to complete the project out of sequence as other trades continued to work on the jobsite. We have been impacted by having to leave the project and come back to complete our work. Additionally, we were not able to order and release equipment to maintain the critical path of the project and sequence our work with the work of other trades.  Exhibit 1

None of these additional costs could have been predicted from the contract documents. The delays are outlined below.

**EXHIBIT**
1

Plumbing

- During the demolition phase, asbestos was discovered in the 3rd Floor ceiling where a significant part of our work was located. The plumbing demolition was delayed for several weeks during the month of August and September 2001 while the asbestos removal was completed.

- RFI responses were delayed for many months and or answered incompletely:

RFI #02 Bedpan Washer submitted on June 6, 2001 – On October 11, 2001 we received from PBM, the VA's responses dated October 3, 2001. The response partially answered the RFI but cut sheets were not provided. The answers were late and incomplete delaying the rough in of the bedpan washers. Exhibit 2

RFI #03 Nourishment Unit. submitted on June 6, 2001. Though the answer (dated 10/03/01) referenced the details of the drawings, the detail did not have dimensions for installing the piping. This was noted on our RFI #014 dated October 10, 2001. At the jobsite meeting of November 28, 2001 we were told that the drain was centered on the units.

However in our jobsite meeting of November 30, 2001 we were shown a unit that the VA was looking to purchase and the drain was not centered. In fact, the VA's decision on which unit to purchase has never been known. And the VA has never forwarded cut sheets of the nourishment unit. As of this date August 7, 2002 we are currently installing fixtures and no nourishment unit is in place for us to hook-up. Exhibit 3

RFI letter dated August 22, 2001. It took almost three months to receive any kind of answer to these questions. The delay in these answers seriously impacted our work as detailed below. Exhibit 4

Item #1 Existing floor and ceiling penetrations - were not able to be repaired until after walls had been built. This work took longer to complete because it had to be done out of sequence.

Item #2 Air Induction units - we never received direction until January 16, 2002, almost 5 months later. All the while having to work around these units in the performance of our work.

Item #3 PVC waste piping on the third floor – existing work does not meet current code requirements. On November 16, 2001, we were told that this was an existing condition and not part of the contract.

Item #4 Relocated waste and vent risers. On November 16, 2001 we were asked to provide the exact location of the risers in question. We had already provided this information in our follow-up RFI #09 dated September 6, 2001.

2

We were then asked to provide a credit for the relocation of the waste and vent risers on December 14, 2001. This was credited back to the VA on our change request #18 dated December 19, 2001 and a change order was not received until March 18, 2002.

This delay seriously hampered our efforts to schedule and complete the under floor and above floor waste and vent piping associated with tie-ins to these four riser groups. We could not establish the elevations of the waste lines until the locations were determined.

RFI #008 Waste Piping- On September 6, 2001 we sent notification that the waste piping as shown on the drawings was in conflict with the existing ceiling heights. On October 10 we sent notification that this RFI along with others was over 30 days old and was delaying our progress. On October 11, the VA responded by saying that ceilings could be lowered or bulkheaded to solve the problem.

This solution would have had a significant cost and time impact. It was not until November 28, 2001 that this subject was entertained again by the VA in a jobsite meeting. It was decided that we would meet on November 30 to do a field review of these areas and that the VA would provide a sketch of the piping for review.

On November 30 we reviewed VA's sketches of the four bathrooms in the south wing. December 12, 2001 we submitted our change request #017 for revised waste piping in the South Wing as per the sketches reviewed on Nov. 30.

It was not until February 7, 2002 that we received a letter via fax dated January 28, 2002 requesting further breakdown of our change request. We responded with a letter dated February 16, 2002 listing our reasons for the increased costs and giving further breakdown. Additionally, we stated that we would proceed with the work in good faith in order to keep the progress of the job going. On March 28, PBM notified us that the VA had issued a change with a significantly reduced amount and that they were trying to negotiate the balance. Currently, we have completed the work and have not received any change order. Exhibit 5

RFI #011 Plumbing Fixture P-528 Faucet - submitted on October 9, 2001 referenced a change made to a faucet on fixture P-528. This faucet was to be installed in a standard kitchen sink, which is not made for a faucet with 4" centers. This began another lengthy change order process, with our change request being forwarded to PBM on November 06, 2001 and though notification of acceptance was received on November 30, 2001, a written change order was not received until December 14, 2001. At this point the rough in of the project was well under way and it was during this time that we had to pull off the project due to lack of answers of which this was one. Exhibit 6

RFI #15 Relocated Water Cooler submitted on October 15, 2001 requested information on the relocated water coolers. On November 30, 2001 we were given cut sheets on an Elkay water cooler to furnish. In the course of resolving this issue we submitted pricing on two different models of water coolers at the VA's direction.

3

Finally, on Jan. 16, 2002, three months later, we received notice that the VA elected to purchase these units. And when we started installing fixtures in late June the water coolers were still not purchased. Exhibit 7

- Waste piping in 3rd Floor ceiling could only be done one area at a time, ceilings were not removed as shown on the drawings. The 3rd floor was still in use with patients while we worked. It was an unforeseen condition of the contract that the floor would be occupied or done in small phases. The drawings called for large areas of the ceiling to be removed. This representation indicates that the floor would be unoccupied. There was lost time in-between each area while we waited for one area to be reopened and another to be made available. Live waste discharges while we were performing the waste work caused us to stop work till we were assured that all above floors were shut down. This happened at least three times. One incident caused us to loose over two days time for three men.

- Plumbing submittal for Wade cast iron drains and carriers sent June 2, 2001and returned September 25, 2001 (96 days) prevented us from ordering the carriers. The lack of approval delayed release of the material for fabrication and delivery. These items had a long lead time. We had to install the material out of sequence because of the late deliveries. Exhibit 8

- Additional Patient Room Lavatories – in June of 2001 we received a set of prints marked in pink highlighter and were requested to price the furnishing, rough-in and installation of fourteen (14) new wall-hung lavatories for each of the patient rooms. On July 5, 2001, we submitted our change request #02 for $52,235.00.

Throughout the remainder of the summer, we corresponded, revised and itemized our pricing for this work. Repeatedly we were told that our itemized breakdowns were "insufficient and incorrect", needed more detail and that our mark-ups were calculated incorrectly. This was a strange request since all we were given to work with was locations marked in pink highlighter. No plumbing drawings were issued for this work.

In early September we met with the VA to do further value engineering and to discuss our price. This meeting resulted in an agreement to delete the lavatory carriers which were standard and specified on all the other sinks and to delete one core drill for each of five lavatories installed in a back to back configuration with another lavatory. This revised pricing was sent on September 12, 2001 with the corresponding itemizations and a note that the change request was good for 18 days (until September 30, 2001) with the price subject to escalation after. This was due to the fact that we were preparing to core drill and install the lavatories in the patient bathrooms and this work needed to be done in sequence with that work.

After all this effort, finally, at the November 28th meeting we were told that the VA did not have the money to do this work. We then suggested and subsequently forwarded a price (change request #16 dated December 14, 2001) to at least install the piping in the walls which could be connected to later. On December 27, 2001 we received a change order dated December 20, 2002 to do this work. The work would

4

now have to be done months out of sequence. The change order estimate cost did not include doing this work out of sequence. Exhibit 9

- Shower enclosures - The shower enclosures were specified to be installed in a 2" deep pit. This could not be done since the existing concrete floor was only a maximum of 4" and in some places thinner and a 2" pit would compromise the integrity of the floor.

  On June 7, 2001 we were requested by PBM to provide a price to furnish and install the showers since they were not in our contract. On July 11, 2001 we forwarded two prices – one for furnishing only and one for installation only.

  No decision was made until October when we were asked to provide a price for an alternate shower unit. On October 19, 2001 we forwarded cut sheets and a revised change request to furnish the showers only. Later that month we were asked to forward cut sheets and a revised price to furnish the specified units. This we did on November 1st and 2nd respectively.

  At this same time we noticed that both showers had the same rough in for the shower drains and that five of the shower drains were overtop of a concrete beam below. This was discussed in a jobsite meeting on November 14, 2001 with the VA, and PBM. At that time they said they would need to review the problem in the field.

  On November 20, 2001 we met with the VA and the engineer from Gipe Associates. This issue was discussed again and the engineer suggested researching whether the shower manufacturer could offset the drain. Subsequently the manufacturer said they could not do this.

  Finally a decision was made to install the showers which did not need to sit in a recessed pit. And on December 13, 2001 we received a change order to furnish the shower units only. The showers were ordered on the same day on December 13, 2001. And delivered on Monday January 28, 2002. On February 20, 2002 only four shower units had been set in place. The units were set complete by March 13, 2002. We could then connect our waste piping and install the trim inside the units. This was a delay of over six months, that caused us to do our work out of sequence and resulted in lost time. Exhibit 10

## Medical Gas

On June 26, 2001, we submitted the Amico Medical Gas equipment for approval. On July 31, 2001 we received a letter from PBM stating that the Amico equipment complies with the specifications but that the VA would like us to submit on a different manufacturer.

September 27, 2001 we submitted both the Chemtron equipment cuts and a change request #10 for $1,825.00 for the increased costs associated with switching to a different manufacturer. The VA then lost these submittals. And though approved on October 17, 2001 they were not forwarded to us until November 15, 2001.

The change request had not been approved and we could not proceed to order equipment. On Janaury 4, 2002 PBM notified us that the VA had requested them to reduce the price considerably and that they had rejected their offer and were continuing negotiations.

After more than a month on February 8, 2002 we received via fax a letter dated January 28, 2002 notifying us of a unilateral issued for this work and requesting further breakdown of our costs. Our reply on February 16, 2002 detailed our associated costs and included a copy of the quote from the supplier showing both the original price and the revised price.

On February 21, 2002 we received a partial change order of $1,365.25 for the amount the VA had approved and we were notified to proceed. We ordered the equipment on February 28, 2002.

On March 4, 2002 we received a letter from PBM stating that the VA still disagreed with our price and "asserts that the cost would be significantly lower if purchased through... Manage Medical Systems". After notifying PBM in our fax of March 5, 2002 that we had already released the equipment, we sent the equipment list to Manage Medical Systems for a price quote. The same day we received a quote back from them and the following day we forwarded on a copy of their quote with a price comparison to our supplier. Manage Medical Systems was $2,405.00 higher for the equipment alone.

On March 20, 2002 we asked if this information was reviewed and on April 19, 2002 we received the balance of the cost on PBM's change order #06b for $509.75. All this changing and subsequent failure to process both the submittals and then the change request caused undue delay to a key critical path portion of the work. This work was an extensive part of our contract which needed to be completed prior to the close in of the walls and which needed to be done in careful sequence to assure the pipe remained clean. Because of the delays we had to work in pieces. And it was all over $1,825 and the balance, which the VA continued to reject, was for only $509.75. And it was for changes that the VA had requested not C&D. Exhibit 11

- RFI's #031 and 032- Missing medical gas outlet stations and remote alarm panel piping- On March 11, 2002 we requested additional direction on medical gas outlet stations not shown on the drawings. This question arose while we were installing the medical gas equipment and a timely response was critical.

On April 19 we received a response saying that the medical gas piping in this room was typical even though separate equipment was shown in every other room but not in this room. On April 22 we clarified our RFI to state that there was engineering and NFPA 99c issues to consider. We also noted the critical nature of this work and that the lack of clear answers was impacting and delaying our progress.

On April 23, we received answers to RFI # 031. The answer to part 2 was not possible to do because the equipment ordered was not configured to do remote

alarm via DDC as requested. On April 25 we sent comments in reply to the RFI
responses. On May 21, 2002 we forwarded our change request to add new stations
to room 426. Subsequently, we were instructed to proceed by PBM. Again, in order
to keep the job progressing we proceeded in good faith without a change order. As
of August 7, 2002, three months later, the change order has not been received.
Exhibit 11

## HVAC

- Delays to the closing of the elevator lobby kept us from completing the installation of
  VAV's, Insulation, and Hot Water piping work in this area. On March 20, 2002 we
  notified PBM that we were ready to test the heating water piping but are unable to
  complete because we were not able to access this area. This work was not made
  available to us until mid-June 2002, which caused us to do the work out of
  sequence, and additional testing of the mains including this piping was required.

- RFI responses were delayed for many months and or answered incompletely:

  RFI #020 Laundry Chute- dated October 26, 2001 simply requested a change from
  square duct in the round laundry chute to round duct so it could fit. The size of the
  square duct was too large to fit in the existing round laundry chute, which was to be
  used as a chase. This change had been explained verbally to the VA's rep. We did
  not receive an answer to this until December 3, 2001. All the while our sheet metal
  work had to come to a halt on this system. Exhibit 12

  RFI #027 4" Steam Main- On January 22, 2002 we forwarded a request to the VA for
  access to the area of the 4" low pressure steam main tie-in and piping run. We were
  told that this area would not be vacated and available until March 11, 2002 just over
  a month prior to the scheduled completion date of the project.

  On March 20 we sent another request asking when this area would be ready for us
  to begin work. This work area was not made available to us until mid-April. When
  we could finally access this area it was discovered that the steam main was 3" rather
  than 4". We sent RFI #033 on April 18, 2002 to which we received a response on
  April 23, 2002. Rerouting of this pipe was partially related to the revised drawings of
  11/10/00. The change order request for the revised drawings dated 11/10/00 was
  not approved, we were not able to start our work. We received the change order on
  July 22, 2002 but it was significantly reduced. It took 4 months for an answer further
  impeding the progress. Exhibit 13

- Pipe Insulation Submittals- submitted on August 3, 2001. A notice was sent on
  November 6, 2001 regarding overdue approval. The submittal was finally returned
  and marked approved on December 3, 2001. This seriously delayed the insulation
  work from beginning while access to the piping was available. Exhibit 14

- Firestopping Submittals- submitted on August 24, 2001. A notice was sent on
  November 6, 2001 regarding overdue approval. The submittal was returned

approved on December 3, 2001. This seriously delayed the firestopping work from beginning as scheduled prior to the walls being constructed. Exhibit 15

- Delays to the supply duct insulation change request, which still is not resolved, held up the installation of our piping, which ran under the duct. On November 29, 2001 we forwarded an RFI #025 requesting clarification on the supply duct insulation. We were about to begin our piping installation under the ductwork, which was installed and tested. And we noted that we needed this response ASAP.

  On December 12, 2001 we received a response, which cited the incorrect portion of the specification to which we responded and noted in our RFI #026. On December 12, 2001 we sent another letter with a response from our Insulation subcontractor regarding their position and supporting documentation on this matter.

  We were then asked to submit a cost associated with this work which we forwarded on January 21, 2002. All the while, we were delayed from starting our work on the piping mains. We finally started the insulation work in January under protest and noted so on our change request cover letter. Exhibit 25

- Electrode Steam Humidifier- this is another example of how our work was delayed by the VA's failure to act in a timely manner. We submitted on this piece of equipment on June 25, 2001. Repeatedly, throughout the fall months we asked for this submittal to be reviewed with no action by the VA. On January 22, 2002 we received the submittal back approved. Only then could we order this equipment.

  Of interest was a note on the transmittal form from PBM that their copy of this submittal notes that Gipe Associates (the A/E) received this on July 5, 2001and that they forwarded the reviewed submittal to the VA on July 13, 2001. For six months the VA failed to act on this submittal. After repeated notices that this submittal was outstanding. Exhibit 16

- Grilles, Registers and Diffusers- The submittal for the Air Outlets and Inlets was held up for months. This submittal was sent in on September 25, 2001. On October 24, 2001 we received it back rejected.

  However, the reasons given for rejection were that one room had been missed which was correct. And that the CFM values listed on the submittal were incorrect. On November 29, 2001 a revised submittal was forwarded with notes from the supplier which explained that "the CFM values were not shown on the floor plan on drawing M-4." Rather the "CFM values are listed in the air device schedule on drawing M-14. The numbers shown on drawing M-4 are tags referencing the air device schedule."

  In other words, the original submittal was correct. But then, instead of reviewing and returning the submittal in a timely fashion, the VA held on it until PBM personally reviewed the submittal with the VA to show them that the CFM values listed on the submittal were correct. The revised submittal was finally signed approved and faxed to us on April 15, 2002. This delay prevented the sheetmetal subcontractor from

8

releasing this equipment until the approval was received. Rough in of the air outlets had to be delayed until we had the approved submittals. Exhibit 17

- ATC- the automatic temperature control system submittal was sent in on October 5, 2001. On November 5, 2001 we received the submittals back with notes "Disapproved" and "Resubmit." Attached were the following three comments:

    "Delta Controls- Orca System shall be completely compatible with the existing Central Building Control System."

    "The control system supplier shall provide at least five (5) similar projects which have building control systems as specified."

    "The control system supplier shall have a minimum of three (3) years experience per Specification 15902-4, paragraph 1.3.A.4."

There were no indications of any other problems with the control design. We were led to believe that the ATC system was acceptable, if we provided the additional three items requested. In response to these requests we resubmitted the Delta Control System on November 12, 2001 with supporting information as requested..

On December 6, 2001 the VA again marked the submittals as "Disapproved Resubmit". On December 11, 2001 we received the submittal back, marked "disapproved and resubmit" with no reason given.

December 14 we received a letter from the VA listing their reasons for rejection of the Delta system. Both reasons given i.e.; language incompatibility and insufficient memory were not requirements of the specifications. Later we were told by the VA that the existing central station had been recently upgraded and had plenty of memory space.

On December 19· we met with the VA to review their current system to verify if indeed the Delta system we submitted would be compatible with their existing CSI system. The VA would not allow our control subcontractor to attend the meeting. During that meeting we were told by the VA that it didn't matter to them whether or not the Delta system was compatible or not, they wanted a CSI system.

On January 7, 2002 we sent a fax requesting a written request from the VA to price a change from Delta to CSI. On January 24, 2002 PBM sent a communication from the VA saying, "The VA declares that the primary reason for rejection is the inability of the submitted ATC system to meet the specs. Particularly Section 15902, Part 1-General, 1.1, Subsection B. PBM respectfully requests that you provide either ample documentation as to how and why this system meets the spec or revised submittals for a system, which complies with the spec."

Our letter of January 31, 2002 responds to this request and outlines to the VA the reasons that the Delta is in fact compatible. Additionally, we requested the VA to have the engineer of record from Gipe Associates review the revised submittal dated

9

November 12, 2001 for compliance with the spec. We never received a response to this request. However, in a later phone conversation with Rob Weaver of Gipe Associates on April 30, 2002 he said that he had reviewed the submittal and that it did meet the specifications.

The next communication dated March 6, 2002, received March 11, we were asked by the VA to provide a credit for the ATC system. Per PBM direction on March 12 we did not submit the credit change order. PBM was waiting for further direction from the VA.   This began another whole series of back and forth communications to negotiate a credit. A process which is still not resolved.

The VA has hired another control subcontractor who only recently began working on the project.

The point of this lengthy explanation is that the VA's failure to act in a timely fashion on this critical path item caused us to be delayed in the installation of the control valves for the twenty nine VAV, two AHU and two Unit Heater coils. Normally the ATC contractor supplies these valves and in this case they were in our control subcontractors contract. Because we could not wait any longer for this to be resolved and in the interest of the progress of the job we proceeded to order the valve bodies so we could at least get them installed, tested and complete the insulation of the coil assemblies. However, this still caused us to do this work out of sequence long after the piping to these pieces of equipment was run. And due to the schedule requirement to complete the ATC system sometime in August 2002, we will not be able to start our equipment until they are done later this summer. This circumstance is impacting the balancing work. We are unable to start this work until the HVAC systems are complete. Exhibit 18

- Revised Drawings 11/10/00 and associated equipment  The bid drawings were dated 7/24/00. On April 16, 2001 we were asked to price the revised set of drawings dated 11/10/00. The revised drawings consisted of changes to the piping, ductwork, mechanical equipment, and associated insulation. The bid documents with the addendum included a packaged Domestic Water Heater, a field fabricated HVAC Heat Exchanger and a Simplex Domestic Water Booster System. We submitted a price as change request #01 on April 30, 2001. The change order request included the following work:

  Credit for the base bid work that was no longer required on the revised Drawings
  - Delete the Hot Water Pumps
  - Delete the Heat Exchanger
  - Delete the Expansion Tank and Air Separator.
  - Delete the labor and materials associated with this work

  Add for the work associated with the revised equipment
  - Add Expansion tanks, Air Separator  and heating specialties
  - Add Hot Water Pump
  - Add Heat Exchanger
  - Add Insulation for additional pipe

- Labor and material for additional equipment and piping

This began a series of re-pricing and revised change requests that still has not been resolved sixteen months later. On May 10, 2001 we were forwarded letters from the VA dated May 4 and 10 asking for clarifications. We responded to all questions and provided additional breakdown of material costs. We did not receive any response to our answers. This change order was later voided by subsequent changes by the VA.

On June 13, 2001 we were faxed a set of sketches of two pieces of equipment from Armstrong Equipment which replaced the base bid equipment. The field fabricated HVAC Heat Exchanger was revised to a packaged Hot Water Heat Exchanger with 2 heat exchangers each. And the Domestic Water Booster System was also revised. (The base bid equipment had also been revised in the 11/10/00 drawings) The fax requested a credit for the VA to furnish this equipment. On June 21 we sent a letter to the PBM requesting additional information.

On June 25, 2001 the VA clarified the scope of work in response to our request of June 21. On July 12, 2001 we sent the credit as requested. The credit was for deleting the following items:

     HWH Pumps
     Heat Exchanger
     Exp Tank
     Air Separator
     Pipe and Steam Specialties
     Domestic Booster System
     Insta Hot System

This credit is for the equipment included in the base bid. There was no credit for the labor as we were still required to receive and install the equipment per the base bid.

However, there were now two issues to consider:

1.    If the credit was accepted and the VA provided the Armstrong Equipment, we would have to revise our price for the revised drawings of 11/10/00 (COR 1). Because this credit was for deleting the Mechanical Room equipment from the base bid and installing equipment that was different than the equipment in Change Order Request 1 (dwgs 11/10/00)

2.    We would need to revise the price for the mechanical room work necessary to make the Armstrong equipment work since this work would be different from both the 7/24/00 and the 11/10/00 drawings

On August 1, 2001 we received a request to price purchasing and installation of the Armstrong equipment. On August 17, 2001 we responded with another price as requested. The change order request was for furnishing the Associated Steam

11

Domestic and Heating Water Heaters, installing the equipment and a credit for the base bid material and equipment. The breakdown follows:

Furnish associated Steam Equipment:

| | | |
|---|---|---:|
| Domestic Hot Water Unit | | $29,145.00 |
| Hot Water Heating Unit | | 33,980.00 |
| | | $63,125.00 |
| 10% Overhead on 1st $20,000 | | 2,000.00 |
| 7.5% Overhead on next $30,000 | | 2,250.00 |
| 5% Overhead on balance of $13,125 | | 656.25 |
| | | $68,031.25 |
| 10% Profit on $20,000 | | 2,000.00 |
| 7.5% Profit on next $30,000 | | 2,250.00 |
| 5% Profit on balance of $18,031.25 | | 901.56 |
| | Subtotal | $74,182.81 |
| Bond | | 1,463.66 |
| | TOTAL | $74,646.47 |

The labor to install heating units:

| | | |
|---|---|---:|
| Foreman | 20 Hrs. @ $74.00/hr | $ 1,480.00 |
| Plumber/Pipefitter | 196 Hrs. @ $67.50/hr | 13,230.00 |
| | | $14,710.00 |
| | 10% Overhead | 1,471.00 |
| | | $16,181.00 |
| | 10% Profit | 1,618.00 |
| | | $17,799.00 |
| | Bond | 355.98 |
| | | $18,154.98 |

The credit for the base bid equipment, material and labor is as follows:

| | |
|---|---:|
| One (1) Armstrong Domestic Water Unit | $17,945.00 |
| Two (2) Armstrong In-Line Pumps | 1,420.00 |
| One (1) Heat Exchanger | 785.00 |
| One (1) Air Separator | 280.00 |
| One (1) Expansion Tank | 428.00 |
| Interconnecting pipe + steam specialties | 2,000.00 |
| Labor – 64 hrs. @ $67.50 | 4,340.00 |
| **TOTAL DEDUCT** | **$27,198.00** |

On September 13 we submitted Change Order Request 9 for the work outlined on the 11/10/00 drawings without the revised equipment from those drawings. The adds and deducts were similar to the April 30, 2001 change order requests, except we made no changes to the equipment.

| | |
|---|---:|
| Labor Plumber 290hrs * 67.50. | - 19,575.00 |
| Material | - 3,128.00 |
| Subtotal Credit | - 22,703.00 |

| Revisions | Hours | Material |
|---|---|---|
| Pipe | 103 | 2,427.00 |
| Fittings | 170 | 982.00 |
| Valves | 22 | 3,404.00 |
| Hanger | 188 | 1,575.00 |
| Balance Valves | 3 | 310.00 |
| Core Drill | 8 | 500.00 |
| Mix Valve | 3 | 1,500.00 |
| Make Up water Accessories | 1 | 650.00 |
| Stream Trap | 2 | 125.00 |
| Triple Duty Valves | 6 | 600.00 |
| Subtotal Material | 506 | 12,073.00 |
| Insulation | | 1,630.00 |
| | | |
| Labor  Foreman-50hrs *74 | | 3,700.00 |
| Labor  Plumber-506hrs *67.50 | | 34,155.00 |
| | | |
| Subtotal Revisions | | 51,558.00 |
| | | |
| Subtotal Revisions - Credits | | 28,855.00 |
| | | |
| 10% Overhead on 20,000.00 | | 2,000.00 |
| 7.5% Overhead on 8,855.00 | | 664.00 |
| Subtotal | | 31,519.00 |
| | | |
| 10% Profit on 20,000.00 | | 2,000.00 |
| 7.5% Profit on 11,519.00 | | 864.00 |
| Subtotal | | 34,383.00 |
| | | |
| Bond | | 688.00 |
| | | |
| TOTAL | | 35,071.00 |

In addition on September 13, we summarized the changes we believed the VA was proceeding with related to these revisions.  We also noted the delay that this was having on us proceeding on this portion of the work, which was a major component of the heating system and domestic water system.

1. Add revised drawings 11/10/01 without equipment. (as per letter 9/13/01) — $35,071.00
2. Add install of owner supplied equipment ( as per letter 8/17/01) — $18,154.00
3. Deduct base bid equipment. (as per letter 8/17/01) — -$27,198.00
4. Deduct Domestic Cold Water Booster System (as per CO #08) — -$6,977.00

Net Add     $19,050.00

13

When we first began the job we were told to construct the job according to the revised 11/10/00 drawings. We already had been doing the work related to the revised drawings for which we had not received a change order. Seven months later, November 28, 2001, we were requested by PMB to confirm our quotes for any changes in costs. "We have a received a letter from the VA requesting confirmation of the original quotes, supplied months ago. Please, verify your quotes and note any changes in cost."

We responded on December 7, 2001 with a summary of costs, based on C + D Contractors furnishing the equipment (as directed in the letter of 11/28/01), a request for 16 weeks time extension and notification that there would be a 5% increase if we did not receive a signed change order in 10 days.

| C.O. #05 | 8/17/01 | Equipment | $.74,646.47 |
| | | Install Equipment | 18,154.98 |
| | | | $92,801.45 |
| | | Credit for Base Bid Equipment | -27,198.00 |
| | | | $65,603.45 |
| C.O. #8 | 9/30/01 | Credit to Delete Booster System | -6,977.00 |
| | | | $58,626.45 |
| C.O. #9 | 9/13/01 | Revised Dwgs. 11/10/00 w/o Equipment | 35,071.00 |
| | | | |
| TOTAL | | | $93,697.45 |

On January 23, 2002 we notified PBM that after six weeks we still had not received the change order for the additional work and that the change order price was to be increased by 5% . And that we had proceeded with these revisions per the VA direction and we would include the additional work in our invoice.

On January 24, 2002 the VA again requested us to review our pricing for the VA to furnish Armstrong equipment. On January 24, 2002 we resubmitted that pricing with a 5% increase.

| C.O. #05 | | Install owner supplied Equipment | $35,130.20 |
| | | Credit for Base Bid Equipment | -27,198.00 |
| | | | $7,932.20 |
| C.O. #8 | 9/30/01 | Credit to Delete Booster System | -6,977.00 |
| | | | $955.20 |
| C.O. #9 | 9/13/01 | Revised Dwgs. 11/10/00 w/o Equipment | 36,824.55 |
| TOTAL | | | $37,779.75 |

We were then informed that the VA had issued a unilateral to PBM for the Armstrong units at a significantly reduced price and that PBM had ordered them.

Over the winter and into the spring we repeatedly requested that this issue be resolved as it was seriously impacting the job. We did not know what had been ordered. What parts had been included in the order to Armstrong Equipment? Who would install what? What portions of our change request would be approved? We

14

had to proceed with installation of the mechanical piping otherwise we would have been closed out of areas. The piping had to be installed and tested in sections because we did not have answers on the equipment and the associated piping. The following work could not be completed:

- Steam and condensate return
- Steam Mains and tie ins to existing
- Domestic Cold Water
- Heating Hot Water
- Testing of each system was done with out the equipment and now will have to be retested once each system is complete

The work would have to be done out of sequence and the completion date was slipping. At the meeting on May 23, 2002 when the completion date was extended to September 1, 2002, we made it clear to the VA that these issues still needed to be resolved. In our letter of June 6 we specfied the issues that need to be resolved:

"The following is the list of outstanding issues that need to be resolved for us to meet the September 1, 2002 completion date:

- RFI #024 Domestic Water tie-in to the existing 2" line
- Letter dated 5/9/02 regarding the steam condensate line relocation in exchange for the re-routing of the AHU floor drain.
- Heating Equipment layout and subsequent change order approval.
- Letter 5/3/02 regarding cleaning of the existing oxygen line.
- Change order approval of revised drawing 11/10/00 without equipment revisions – this is needed prior to us proceeding with the steam line work.
-

These are critical path issues that need immediate attention and have been outstanding for many weeks. Because they have not been answered promptly, we are reserving our right to assess the impact of the delay caused by the lack of answers."

These issues sat dormant until the Armstrong equipment furnished by PBM arrived on site and we were again told the job had to be completed by September 1, 2002. Prior to that we had not received the cuts or any drawings on the installation of the systems even though we had requested this information several times.

The Domestic Booster System has not been furnished as outlined in the quote from Associated Steam and the letter from the VA dated June 12, 2001. No drawings had been provided for the piping needed to connect to these Domestic Hot Water Heat Exchanger and Heating Hot Water Heat Exchangers. The pumps have been shipped loose, instead of as a packaged unit as we were directed to price. The way the pumps are configured for installation would obstruct the access in the mechanical room. And no change order of any kind had been issued for this work or the revised drawing work. Because of that we told the VA that we would not proceed until we had a written change order.

We were then asked by the VA to revise our price again to complete the mechanical room with the Armstrong equipment provided and to make the necessary drawings of the piping with direction from the Armstrong supplier and the VA. This pricing,

based on our sketch, was provided on June 28, 2002. We meet with the VA and revised the scope and resubmitted the proposal on July 9, 2002. The proposal is as follows:

| | |
|---|---|
| Base Bid Equipment (itemized above) | - 27,198.00 |
| Balance of Pipe Valves and Fittings as per the attached base bid sketch | |
| Labor – 147 Hours @ $67.50 | - 9,984.00 |
| Material | - 5,662.00 |
| Water Treatment – C.O. #6 is voided and the credit for the chemicals only is | - 475.00 |
| TOTAL CREDIT | - $ 43,319.00 |
| Piping and Valves per our sketch | |
| Labor – 512 @ $67.50 | $34,560.00 |
| Material | 10,677.00 |
| Sketching – 8 hours @ $75.00 | 600.00 |
| Foreman – 51 @ $74.00 | 3,774.00 |
| TOTAL ADD | $49,611.00 |
| NET CHANGE | $ 6,292.00 |
| C.O. #9 Revised Drawings without equipment dated 11/10/01 itemized above $35,071 + 5% increase | $36,824.55 |
| TOTAL | 43,116.55 |

We were told on July 17, 2002 that a change order would be issued. On July 18 we received from PBM a copy of the VA's letters directing the work to be done and the markdown of our prices. Our prices were significantly cut. Our labor rate was reduced over 30%. The labor hours revised. And Change Order Request 9, dated September 13, 2001 was also cut for an undetermined reason. After we had been asked to verify the quotes due to delays on November 28, 2001. We responded on December 7 with a 5 % increase if we did not have an approved change order in ten days. Six weeks later we informed the VA that no decision had been made and to increase our price 5%. Now they reduced the price by 16%.

We were directed by PBM to proceed with the work. We notified PBM on July 19, 2002 that we were proceeding under protest. We received a change order in the amount of $19,992.29 on July 22. Less than 50% of our change order request.

When we priced this revision, June 28, 2002 and July 9, 2002, we needed the following information:

- Domestic Cold Water Booster System – to be priced when RFI #036 is answered.
- Expansion Tanks – to be priced when RFI #036 is answered.
- Insulation of Piping and Vessels on Armstrong Units – to be priced when RFI #037 is answered

16

We are still waiting for the answers. It is four weeks to the completion date. We can not order or submit on the equipment. The Domestic Cold Water Booster System has an eight week lead time. Exhibit 19

We have been delayed from starting any work in a sequential manner. Every mechanical system was installed out of sequence. The mechanical room work was delayed until July 22 when we were directed to proceed with the revisions. Even though our change request that was revised numerous times was arbitrarily revised. Now we have to complete all this work in six weeks and we are still waiting for clarification on items.

We have had material on the job site to do portions of the work. The remaining material had to be relocated from place to place for other trades to do their work. No change order was decided on or written so we could not install the material.

We have worked as directed on the 11/10/00 drawings since April 16, 2001. The design has been changed and revised. No decisions were made in a timely manner. No change orders were written. We have been unable to invoice for the work. We have been financially impacted by the lack of timely direction from the VA.

Construction projects should be a carefully programmed sequence of work to accomplish the project with in the contract time frame. The delays we encountered change this sequence, resulting in delays in the completion of the contract and extra costs to us. Our progress was repeatedly hindered by the owner's lack of timely response and direction. The financial impact is itemized:

Actual + Planned Hours on Job

| | |
|---|---|
| Total Hours expended to June 30, 2002 Exhibit 20 | 4,426. |
| Hours to complete by Sept 2002. Does not include pending CO for equipment | 960. |
| Total Actual + Planned Hours on Job | 5,386. |

Estimated Hours

| | |
|---|---|
| Original Estimated Total Hours | 2,560. |
| Labor Hours included in approved change orders to date | 26. |
| Total Estimated Hours Exhibit 21 | 2,586. |

Estimated vs the Actual and Planned Hours

| | |
|---|---|
| Total Actual + Planned Hours on Job | 5,386. |
| Subtract Total Estimated Hours | 2,586. |
| Additional Hours Spent on job | 2,800. |

17

Labor Costs for Additional Hours Exhibit 22

| | |
|---|---|
| Foreman  924 hours x 70.50 | 65,142.00 |
| Plumber 1,876 hours x 66.00 | <u>123,816.00</u> |
| | |
| Total Labor Costs for Additional Hours | 188,958.00 |
| | |
| 10% Overhead on 20,000 | 2,000.00 |
| 7.5% Overhead on 30,000 | 2,250.00 |
| 5% Overhead on 139,958 | <u>6,948.00</u> |
| | |
| Subtotal | <u>200,156.00</u> |
| | |
| 10% Profit on 20,000 | 2,000.00 |
| 7.5% Profit on 30,000 | 2,250.00 |
| 5% Profit on 150,156 | <u>7,507.80</u> |
| | |
| TOTAL | $ 211,913.80 |

Supporting documents are enclosed  Exhibit 20 - Summary of Labor and Payroll Reports.  Exhibit 21 - Original Estimate and Change Orders Hours



<u>Pending Change Orders</u>

Several change order requests have not been resolved.

<u>COR 12</u>      <u>Reinsulating the abated piping.</u>  There are two issues within this change order request.

1.  While the specification outlines the approximate amount of piping to be abated it does not provide the details of the sizes.  The insulation subcontractor could not accurately estimate the cost to reinsulate the pipe without the pipe sizes.

2.  The specification lists the approximate quantities of abated pipe.  The actual amount abated exceeds this amount.  We have requested the abatement documents to verify the quantities.  We have not received the records to verify our counts.

The specification section 15250.Part 3 Paragraph 3.1C states:

"Where removal of insulation of piping and equipment is required to comply with Section 01569, Asbestos Abatement, such areas shall be reinsulated to comply with this specification."

This requires piping that has been abated per Section 01569 to be reinsulated.

Specification Section 01569, Asbestos Abatement Paragraph 1.1.2B "Extent of Work states:

18

Below is a brief description of the estimated quantities of asbestos containing materials to be abated. These quantities are for informational purposes only and are based on the best information available at the time of the specification preparation. The Asbestos Abatement Contractor shall satisfy himself as the actual quantities to be abated. Nothing in this section may be interpreted as limiting the extent of work otherwise required by this contract and related documents.

Removal, clean-up and disposal of asbestos containing materials (ACM) and asbestos contaminated elements in an appropriate regulated area in the following approximate quantities:

<u>Fourth Floor West Side Renovations</u>

627 Feet Asbestos pipe insulation in vertical plaster walls chase

564 Feet Asbestos pipe insulation concealed above plaster ceiling

161 Feet Asbestos pipe insulation above drop-in ceiling tile

112 Sq. Ft.    9" x 9" Floor Tile

400 Sq. Ft.    Carpet with asbestos sheet goods and asbestos floor tile beneath it."

Specification Section 01569, Asbestos Abatement Paragraph 1.2B Variation in Quantity" lists states:

"The quantities and locations of ACM as indicated on the drawings and the extent of work included in this section are estimates which are limited by the physical constraints imposed by occupancy of the buildings. Accordingly, minor variations (+/-25%) in quantities of ACM within the regulated area are considered as having no impact on contract price and time requirements of this contract. Where additional work is required beyond the above variation, the contract time and price will be adjusted under provisions of the applicable clause in the contract. Additional or reduced abatement work beyond the variations will be basis for adjusting the contract price."

The abatement contractor may not need to know the pipe sizes to estimate their work. But for the insulation contractor to properly estimate their work they need to know both the sizes and the type of system so they can determine the thickness required by the specifications. Neither the size of the pipe nor the insulation thickness was provided on the drawings or specifications. As mentioned in the specification access to the piping was limited. The piping was concealed so field observation of the pipe sizes prior to bidding was impossible. The documents did not provide the information necessary to estimate the work.

The specification allows for the additional work that is required to be compensated for per the contract. We are requesting to be compensated for the additional insulation and adjustments for the size of pipes that are now known.

The following costs were incurred completing this work

| | |
|---|---|
| Insulation Specialist | 18,500.00 |
| C + D Contractors Inc | 3,256.00 |
| Subtotal | 21,756.00 |

| | |
|---|---|
| 10% Overhead on 20,000.00 | 2,000.00 |
| 7.5% Overhead on  1,756.00 | 131.70 |
| Subtotal | 23,887.70 |
| | |
| 10% Profit on 20,000.00 | 2,000.00 |
| 7.5% Profit on 3,887.70 | 291.58 |
| Subtotal | 26,178.28 |
| | |
| Bond | In summary |
| | |
| Total | 26,178.28 |

These cost were based on actual installed piping. We asked for the abatement records of feet removed. We have verified the footage with the abatement removal records. We have not received that information. Exhibit 23

COR 13  Firestop of Existing Floor and Ceiling Penetrations.  This change order request is for the labor and material required to firestop pipe, conduit, duct and abandoned penetrations in concealed and unknown existing penetrations.  While the specification requires that penetrations through smoke and fire barriers be firestopped.  The specification is referencing new penetrations through new work.  The specification does not address preexisting penetrations that do not meet the current firecode.   In addition these penetrations were not shown on the drawings and could not be observed during the bidding process.



Specification Section Part 2 Products -15250 2.2 - C Firestop Pipe and Duct Insulation states:

Firestop Pipe and Duct Insulation:

1.   Provide firestopping insulation at fire and smoke barriers through penetrations.  Fire stopping insulation shall be UL listed and as defined in Section 07270, FIRESTOPPING.

2.   Pipe and duct penetrations requiring fire stop insulation including, but not limited to the following:
    a.   Pipe risers through mechanical room floors
    b.   Pipe or duct chase walls and floors
    c.   Smoke partitions
    d.   Fire partitions

The penetrations we are requesting additional compensation for are the preexisting holes which penetrate the 4th floor ceiling slab to the 5th floor and the 4th floor slab to the 3rd floor and within the 4th floor.  This includes mechanical and electrical penetrations as well as abandoned penetrations.  The penetrations were concealed prior to the asbestos abatement

We are asking to be compensated for concealed and unknown existing penetrations. This work is clearly above and beyond the scope of the contract. Exhibit 24



The following costs were incurred completing this work

| | |
|---|---|
| Insulation Specialist | 12,500.00 |
| C + D Contractors Inc | 2,442.00 |

20

| | |
|---|---|
| Subtotal | 14,942.00 |
| 10% Overhead on 14,942.00 | 1,492.20 |
| Subtotal | 16,434.00 |
| 10% Profit on 16,434..00 | 1,643.40 |
| Subtotal | 18,077.40 |
| Bond | In summary |
| Total | 18,077.40 |

.COR 19  Additional Insulation of the Concealed Supply Duct.

We proceeded with the insulation of the concealed supply duct under protest.  Using the 2" thick and 1 lb. density that the owner instructed us to use.  We do not agree that the specification requires us to do this work.

Specification Section Part 2 Products -15250 2.2 – D Mineral Fiber Installation states:

> D. ASTM C553 (Blanket, Flexible) Type I, Class B-3, Density 16 kcm (1 pcf),k=0.045 Watt per meter per degree C (0.31), for use at temperatures up to 204°C (400°F):
>
> 1. Concealed supply air ductwork.
> a.      Above ceilings at a roof level:  50 mm (2 inch) thick insulation faced with FSK.
> 2. Concealed return air duct above ceilings at a roof level and in chases with external wall or containing steam piping: 40 mm (1 ½ inch) think,.insulation faced with FSK. Concealed return air ductwork in other locations need not be insulated.
> 3. Concealed outside air duct: 40 mm ( 1 ½ inch) thick insulation faced with FSK.

The specification does not list any insulation for the concealed supply duct not at a roof level.  The concealed supply ductwork on this project is above a ceiling below another floor, not below the roof.

On a similar project at the VA, completed just prior to this contract, with the same specification format, the concealed supply duct other than roof level was identified in that Specification paragraph 15250 Title  D. 1. b as follows:

> ASTM C553 (Blanket, Flexible) Type I, Class B-3, Density 16 kcm (1 pcf),k=0.045 Watt per meter, per degree C (0.31), Class B-5, Density 32 kcm (2 pcf),
>
> 1. Concealed supply air ductwork.
> a. Above ceilings at a roof level:  50 mm (2 inch) thick insulation faced with FSK.
> b. Above ceilings for other than roof level: 40 mm (1 ½ inch) thick insulation faced with FSK.
> 2. Concealed return air duct above ceilings at a roof level and in chases with external wall or containing steam piping: 40 mm (1 ½ inch) thick, insulation faced with FSK. Concealed return air ductwork in other locations need not be insulated.
> 3. Return air duct in interstitial spaces: 40 mm (1 ½ inch) thick insulation faced with FSK.

In the West 4th Renovations, Specification Section 15250  Part 3 Execution 3.1 G  - HVAC Work Not To Be Insulated states:

21

G.  HVAC work not to be insulated:

1.  Internally insulated ductwork and air handling units.  Omit insulation on relief air ducts (Economizer cycle exhaust air).
2.  Exhaust air ducts and plenums, and ventilation exhaust air shafts.
3.  Equipment:  Expansion tanks, hot water pumps.
4.  In hot piping; Unions, flexible connectors, control valves, PRVs, safety valves and discharge vent piping, vacuum breakers, thermostatic vent valves, steam traps 20 mm (3/4 inch) and smaller.  Insulate piping to within approximately 75 mm (3 inches) of uninsulated items.

This section does not list the concealed supply ductwork.

The Specification Section 2  does not list a product for the concealed supply ductwork.  No specific thickness or density is listed under Section 2.  On the previous project the Specification outlined this specific duct system and the product to be used

The VA position's is that the supply duct was not excluded in the "not to be insulated" Section 3.  But other HVAC work that does not get insulated is not here either.  For instance the return air duct is not listed and it does not get insulated.

The specification gives no direction on how to insulated this system.  There are no directions to the bidder on what product is to be installed on the concealed supply ductwork.  There is not enough information for a bidder to include it in their price.  It is not understood from the specification that the concealed supply ductwork is to be insulated.  We should be compensated for this additional work.  Exhibit 25

The costs associated with this additional work are:

| | |
|---|---|
| Insulation Specialist | 8,800.00 |
| C + D Contractors Inc | 2,960.00 |
| | |
| Subtotal | 11,760.00 |
| | |
| 10% Overhead on 11,760.00 | 1,176.00 |
| Subtotal | 12,936.00 |
| | |
| 10% Profit on 16,434..00 | 1,293.60 |
| Subtotal | 14,229.60 |
| | |
| Bond | In summary |
| | |
| Total | 14,229.60 |

## Revised Drawing 11/10/00 and Associated Equipment

After the numerous revisions and repricing of the equipment changes outlined above, we were told on July 17, 2002 that a change order would be issued for the work outlined on our July 9 letter.  On July 18 we received from PBM a copy of the VA's letters directing to the work to be done and the markdown of our prices.  Our prices were significantly cut.  Our labor rate was reduced over 30%.  The labor hours revised.  And

22

Change Order Request 9, dated September 13, 2001 was also cut for an undetermined reason.

We were directed by PBM to proceed with the work. We notified PBM on July 19, 2002 that we were proceeding under protest. We.

At the meeting on May 23, 2002, we were asked to review our labor rate on change orders. We carefully reviewed the specification sections and checked our calculations. We removed two items from our wage rate because we thought it was open to interpretation if they were reimbursable by the VA. Our revised rates are Foreman $70.50 and Plumber/Pipefitter $66.00. The breakdown of the rate is shown in exhibit 22. Per the specification these cost are compensable.

Our change estimates were carefully calculated to reflect the cost required to make the revisions. Outlined below is an itemized accounting of our estimated costs for the revisions in the Mechanical Room to the base bid drawings dated 7/24/00, made by the addition of the two Armstrong Packaged Units (furnished by others) and the drawing revisions dated 11/10/00. The labor rate was modified from the original change order request to reflect the compensable cost per the specification. The Labor Hours are based on the MCAA Estimating Manual. Breakdown of our cost is expanded itemized material:

CREDITS

| | |
|---|---|
| Base Bid Equipment (itemized above) | $ 27,198.00 |
| Balance of Pipe Valves and Fittings as per the attached base bid sketch | |
| Labor – 147 Hours @ $66.00 | 9,702.00 |
| Material | 5,662.00 |
| Water Treatment – C.O. #6 is voided and the credit for the chemicals only is | 475.00 |
| TOTAL CREDIT | – $ 43,037.00 |

ADD

| Revisions | Hours | Material |
|---|---|---|
| Pipe  280' | 49 | 885.00 |
| Fittings  85 | 230 | 457.00 |
| Valves  49 | 50 | 6,430.00 |
| Hanger | 89 | 950.00 |
| Air Separator | 4 | 0.00 |
| Balance Valves | 7 | 660.00 |
| Heating Pumps | 24 | 0.00 |
| Heating Recirc Pumps | 24 | 0.00 |
| Pressure Reducing Valves | 8 | 0.00 |
| Steam Traps | 5 | 525.00 |
| Pressure or Temp Gauges | 22 | 770.00 |
| Subtotal Material | 512 | 10,677.00 |
| | | |
| Labor  Foreman-51hrs *70.50 | | 3,595.50 |
| Labor  Plumber-512hrs *66 | | 33,792.00 |
| Labor  Sketcher-8 hrs *75 | | 600.00 |

23

| | |
|---|---|
| Subtotal Revisions | 48,664.50 |
| Subtotal Revisions - Credit | 5,627.50 |
| 10% Overhead on 5,627.50 | 562.75 |
| Subtotal | 6,190.25 |
| 10% Profit on 6,190.25 | 619.00 |
| Subtotal | 6,809.25 |
| Bond | In summary |
| Total | 6,809.25 |

C.O. #9 Revised Drawings without equipment dated 11/10/01 itemized
above $35,071 + 5% increase and the revised labor rate

| | |
|---|---|
| Labor Plumber 290hrs * 66.00 | 19,140.00 |
| Material | 3,128.00 |
| Subtotal Credit | 22,268.00 |
| Revisions | |
| Labor  Foreman-50hrs * 70.50 | 3,525.00 |
| Labor  Plumber-506hrs * 66.00 | 33,396.00 |
| Material | 12,073.00 |
| Insulation | 1,630.00 |
| Subtotal Revisions | 50,624.00 |
| Subtotal | 28,356.00 |
| 10% Overhead on 20,000.00 | 2,000.00 |
| 7.5% Overhead on  8,356.00 | 626.70 |
| Subtotal | 30,982.70 |
| 10% Profit on 20,000.00 | 2,000.00 |
| 7.5% Profit on 10,982.70 | 823.65 |
| Subtotal | 33,806.35 |
| Bond | In summary |
| Subtotal | 33,806.35 |
| 5% increase | 1,724.72 |
| Total COR 9 | 35,531.07 |
| TOTAL Credit-Revisions + COR 9 | 42,340.32 |
| Less PBM Change Order 8 per the VA's approved amount | 19,992.29 |
| Balance Due | 22,348.03 |

We have performed the work requested in the 11/10/00 revisions and the associated
equipment changes.  We need to be paid for our work.  Exhibit 19

24

Medical Gas for Room 426

On March 11, 2002 in RFI 31 and 32, we requested additional direction on medical gas outlet stations not shown on the drawings.  This question arose while we were installing the medical gas equipment and a timely response was critical.

On April 19 we received a response saying that the medical gas piping in this room was typical even though separate equipment was shown in every other room but not in this room.  On April 22 we clarified our RFI to state that there was engineering and NFPA 99c issues to consider. We also noted the critical nature of this work and that the lack of clear answers was impacting and delaying our progress.

On April 23, we received answers to RFI # 031.  On April 25 we sent comments in reply to the RFI responses.  On May 21, 2002 we forwarded our change request to add medical gas outlet stations and separate branch piping with valves to feed room 426. As of August 7, 2002, three months later, the change order has not been received. This additional work is required per to VA's response to RFI 31.  Price is itemized with the revised labor rate.  Exhibit 11

| | |
|---|---|
| Labor  Foreman- 8 hrs * 70.50 | 564.00 |
| Labor  Plumber- 8 hrs * 66.00 | 528.00 |
| Pipe Fittings and Valve | 507.00 |
| Material | 300.00 |
| | |
| Subtotal | 1,899.00 |
| | |
| 10% Overhead on 1,899.00 | 190.00 |
| Subtotal | 2,089.00 |
| | |
| 10% Profit on 2,089.00 | 209.00 |
| Subtotal | 2,298.00 |
| | |
| Bond | In summary |
| | |
| Subtotal | 2,298.00 |

Summary

The costs that we have incurred and will incur as a result of these delays are listed below:

| | |
|---|---|
| Out of Sequence | $ 211,913.80 |
| | |
| Change Orders | |
| Insulation COR 12 | 26,178.28 |
| Insulation COR 13 | 18,077.40 |
| Insulation COR 19 | 14,229.60 |
| Revised Drawings and Equipment | 22,348.03 |
| Med Gas Parts | 2,298.00 |
| | |
| Subtotal | $ 295,045.11 |

25

| Bond | 5,900.90 |
|------|----------|
| Total | $ 300,946.01 |

We are making a claim for delay damages in the amount of $ 300,946. As we discussed at the May 23, 2002 meeting, please submit this claim to the VA for resolution.

Sincerely,

C + D Contractors, Inc.

Kathleen Ryan

26

**EXHIBIT "2"**

J-30-02. 17:01 FROM:ABMME FAX #1    ID:3028852222    PAGE 1/18



**DEPARTMENT OF VETERANS AFFAIRS**
Medical and Regional Office Center
1601 Kirkwood Highway
Wilmington DE 19805

In Reply Refer To:

460/90C

August 30, 2002

PBM Construction Group
1300 MedDade Blvd. Suite B
Folcon, PA 19033

Dear Mr. Bennett:

Reference is made to Contract Number V460C-34/Renovate 4 West at this VA Medical Center. We are in receipt of the claim submitted to you by C&D Contractors. A response to this claim will be forward to you in sixty (60) days. If you should have any questions, I can be reached at (302) 633-5371.

Sincerely,

TONI A. WILSON
Contracting Officer



EXHIBIT
2

**EXHIBIT "3"**



**DEPARTMENT OF VETERANS AFFAIRS**
Medical and Regional Office Center
1601 Kirkwood Highway
Wilmington DE 19805

460/90C

October 15, 2002

In Reply Refer To:

PBM Construction Group
1300 MacDade Blvd. Suite B
Folsom, PA 19033

Dear Mr. Bennett:

Reference is made to Contract Number V460C-341Renovate 4 West at this VA Medical Center and the so-called claim that you submitted for C&D Contractors. The package was forwarded to the Defense Contract Audit Agency for auditing. Today I was notified that the claim must be certified to technically begin the claim process.

I am enclosing a copy of the "Disputes" clause, which provides the language of the certification. When I receive the required certification the processing of the claim can begin. If you should have any questions, I can be reached at (302) 633-5371.

Sincerely,

*Toni A. Wilson*

TONI A. WILSON
Contracting Officer

Enc.

*from  PBM*

*Sent COPY TO STARFIELD HAYNE*
*X 10/15/02*

EXHIBIT

3

**EXHIBIT "4"**

MAY. 20. 2003  11:23AM



**DEPARTMENT OF VETERANS AFFAIRS**
Medical and Regional Office Center
1601 Kirkwood Highway
Wilmington DE 19805

460/90C

May 19, 2003                                      In Reply Refer To:

PBM Construction Group
1300 MacDade Blvd. Suite B
Folsom, PA 19033

Dear Mr. Bennett:

Reference is made to Contract Number V460C-341Renovate 4 West at this VA Medical Center and the claim, which you submitted, from C&D, I have finally received the results of the subject claim. There are several individuals who must review the claim here at the VA. I anticipate having a response to you no later than June 6, 2003. If you should have any questions, I can be reached at (302) 633-5371.

Sincerely,

TONI A. WILSON
Contracting Officer

5/19/03  CC - Earl /EO/ CHD

PLAINTIFF'S
EXHIBIT
4

# EXHIBIT "5"



**DEPARTMENT OF VETERANS AFFAIRS**
Medical and Regional Office Center
1601 Kirkwood Highway
Wilmington DE 19805

460/90C

June 5, 2003

In Reply Refer To:

PBM Construction Group
1300 MacDade Blvd. Suite B
Folsom, PA 19033

Dear Mr. Bennett:

Reference is made to Contract Number V460C-341 Renovate 4 West at this VA Medical Center and the claim, which you submitted, from C&D. As I indicated in my previous letter the results of the audit were received. The VA has reviewed the results and as indicated by VAAR 833.214 Alternative Dispute Resolution (ADR) at this time you are offered the opportunity to resolve this claim using the Alternative dispute resolution procedure. The ADR is non-binding on both parties should an agreement not be reached.

Please notify me in writing if you would like to schedule an ADR. If you should have any questions, I can be reached at (302) 633-5371.

Sincerely,

TONI A. WILSON
Contracting Officer

6/5/03 - Cc For
C+D

**PLAINTIFF'S EXHIBIT**
5

# EXHIBIT "6"



**C+D** Contractors, Inc. ──────────────────────────

May 10, 2004


Ms. Toni Wilson
Department of Veterans Affairs
Medical and Regional Office Center
1060 Kirkwood Highway
Wilmington, DE  19805

RE:    4th Floor West Renovation
         VA Medical Center

Toni,


As requested in our meeting on April 13, we reviewed our claim of August 8, 2002 to determine how the delays impacted the job progress causing the labor overruns.  As we have previously documented in the claim the differing site conditions, lack of timely answers to our RFI's, delays and lack of approval of submittals, and lack of direction to the numerous change requests delayed our work.  Causing this project to run six months past the scheduled completion date.

The project was scheduled to be complete in one year.  When we estimated the project we based our cost on the one year completion.  The estimated schedule illustrates that there was sufficient time to complete the work per the completion date.  Our estimate and the estimated schedule are attached as Exhibit A.

Due to the inefficiencies caused by the delays and differing site conditions the actual labor expended on the project exceeded the estimated hours by 2,532 hours.  The estimated schedule shows that the normal sequence of work this project should have followed.  Due to the numerous problems the work was not completed in a sequential manner.  The Hours per Week Summary, Weekly Payroll Summary and the Actual Work Schedule are attached.  Exhibit A ───



We broke the estimate down in work items.  From there we compared the estimated labor hours to the actual labor hours.  We identified the following problems and the associated labor overruns:

| Issue | Overrun Hours |
|---|---|
| Demolition | 318 |
| Waste and Vent | 1,411 |
| Demobilize | 48 |
| Fixtures | 193 |
| Medical Gas | 128 |
| Mechanical Room | 246 |
| Unscheduled Holiday | 60 |
| Waste Exposure | 128 |
| Total | 2,532 |

Each issue is expanded below.  Schedules of actual hours per issue and backup documents are included as Exhibits B – I.  In addition refer to exhibits in the August 8, 2002 claim books.

Demolition                318 hours

Based on the plans and specifications, we estimated that the demolition phase of the work was to be completed in 157 hours. The scope of work outlined was on the drawings.  Cut and cap piping and removal of piping.  Exhibit B

The contract drawings show the removal of the plaster ceilings on the third floor where the plumbing systems had to be removed and the new systems installed. The contract scope of work was significantly impacted when the ceilings were not removed as shown.  We had to remove the existing pipe system through access panels or small areas of removed ceilings.  This meant that our level of difficulty of demolition was greatly increased.  Impacting the amount of time required to existing work.  This work was done while the 3rd floor was in full operation and consideration for the patients and staff added to the time to complete the work.

The mechanical and plumbing demo drawings for the fourth floor show the existing pipe to be removed.  Instead of going on the floor and doing all the demo, we were limited to removing section at a time.  The VA had to isolate individual sections to be removed instead of isolating the entire floor for demo and removal.  It was difficult to coordinate these shutdowns in a timely manner with the VA.

The actual work for the demolition and layout occurred from mid June to September 28th, 2001. According to the certified payroll reports and daily logs we expended 475 hours of labor to complete this work. Due to the differing site conditions it took additional 318 hours to complete this work.

|      | Actual Hours | Estimated Hours | Change Order Hours | Total Est Hours | Overrun Hours |
|------|--------------|-----------------|--------------------|-----------------|---------------|
| Demo | 475          | 157             |                    | 157             | 318           |

### Waste and Vent                    1,411 hours

The plumbing system installation was seriously impacted by the differing site conditions, lack of timely answers to our RFI's, delays and lack of approval of submittals, and lack of direction to the numerous change requests. The work was not able to be completed in a systematic way. We started and stopped, jumped from one area to another, did the above floor waste before the below ceiling was problems were resolved. The outcome was a 1,411 hour overrun on this work. Exhibit C

### Waste Piping

The most significant problem was the waste piping. Due to the bottom elevations of the existing concrete beams the waste piping could not be installed as shown on the drawings without coming below the existing ceiling level. We brought this issue to the VA's attention in our RFI #08 dated September 6, 2001. On October 10, 2001 we sent notification that this RFI along with others was over 30 days old and was delaying our progress.

We could not proceed with the installation of the waste piping. Typically the waste piping is installed first. Then the copper pipe is installed to the fixtures. Then the walls are closed up, then finishes applied and the fixtures hung. That did not happen here. Everything was out of sequence. First we did above floor waste and vent then the copper mains and branches, then stopped. Then three months later did the waste and vent. Because we could not install the waste piping and test the combined waste and vent, the other trades could not follow and apply the finishes this delayed the installation of the fixtures.

On October 11, the VA responded by saying that ceilings could be lowered or bulkheaded to solve the problem. This solution would have had a significant cost and time impact for the ceilings, lights and existing sprinkler systems.

By November 22, we had installed as much of the plumbing systems as we could above the floor. We had to leave the job. We could not proceed due to lack of timely answers. We had waited three months for direction. The plumbing system could not be completed on the fourth floor without the waste piping on the third ceiling. Other trades were being impacted.

At a jobsite meeting on November 28, 2001 this subject was discussed again. It was decided that we would meet on November 30 to do a field review of these areas and the VA would provide a sketch of the piping for review that would eliminate the extensive extra work by the other trades

On November 30 at a field meeting, we reviewed the VA's sketches of the four bathrooms in the south wing. December 12, 2001 we submitted our Change Order Request 17 for revised waste piping in the South Wing as per the sketches reviewed on November 30.

In our meeting of November 30, 2001, it was agreed that the VA would subsequently survey the other problem waste line routings and set up further meetings for field review. The VA did not request another meeting. Nor were additional sketches forwarded for pricing

It was not until February 7, 2002 that we received a letter via fax dated January 28, 2002 requesting further breakdown of our change request. We responded with a letter dated February 16, 2002 listing our reasons for the increased costs and giving further breakdown. We proceeded with the work in good faith in order to keep the progress of the job going.

On March 28, PBM notified us that the VA had issued a Change Order for a significantly reduced amount and that they were trying to negotiate the balance. By that time the plumbing rough in work was substantially complete. We had completed the work without a change order. (Exhibit 5 Claim Book)

Ceilings

Waste piping in 3rd Floor ceiling could only be done one area at a time, because the ceilings were not removed as shown on the drawings. And the third floor was kept in operation. The drawings called for large areas of the ceiling to be removed. This representation indicates that the floor would be unoccupied.

The removal of the plaster ceilings was done bathroom by bathroom. This meant that our level of difficulty of installation was greatly increased. We worked in confined spaces and had to cut our piping into half-lengths or smaller to install.

The 3rd floor was still in use with patients while we worked. Which meant that the temporary walls had to go up first then we could proceed. When we were done that bathroom group instead of immediately moving to the next one, we had to wait for the area to cleaned up, temporary walls removed, patients relocated, temporary walls reinstalled in the next area. This greatly hampered our efforts and wasted time.

It was an unforeseen condition of the contract that the floor would be occupied or done in small phases. There was lost time in-between each area while we waited for one area to be reopened and another to be made available. The confined space work above the plaster ceiling increased our labor cost on both the base bid work and the extra work. (Exhibit 5 Claim Book)

Additional Patient Room Lavatories

In June of 2001 we received a set of prints marked in pink highlighter and were requested to price the furnishing, rough-in and installation of fourteen (14) new wall-hung lavatories for each of the patient rooms. On July 5, 2001, we submitted our Change Order Request 2 for $52,235.00.

Throughout the remainder of the summer, we corresponded, revised and itemized our pricing for this work. Repeatedly we were told that our itemized breakdowns were "insufficient and incorrect", needed more detail and that our mark-ups were calculated incorrectly. We were given highlighted drawings to work with. Locations were marked in pink highlighter. We laid out the plumbing. No plumbing drawings were issued for this work by the engineer.

In early September we met with the VA to do further value engineering and to discuss our price. This meeting resulted in an agreement to delete the lavatory carriers which were standard and specified on all the other sinks and to delete one core drill for each of five lavatories installed in a back to back configuration with another lavatory.

The revised pricing was sent on September 12, 2001 with the corresponding itemizations and a note that the change request was good for 18 days, with the price subject to escalation after. We were preparing to core drill and install the lavatories in the patient bathrooms and this work needed to be done in sequence with that work.

After spending all this time on value engineering and revisions at the November 28th meeting we were told that the VA did not have the money to do this work. We then suggested and subsequently forwarded a price (Change Order Request 16 dated December 14, 2001) to at least install the piping in the walls for the future installation of the lavatories. On December

27, 2001 we received a Change Order dated December 20, 2002 to do this work. The work would now have to be done months out of sequence. The Change Order estimate cost did not include doing this work out of sequence. (Exhibit 9 Claim book)

<u>Shower Enclosures</u>

The shower enclosures were specified to be installed in a 2" deep pit. This could not be done since the existing concrete floor was only a maximum of 4" and in some places thinner and a 2" pit would compromise the integrity of the floor building system.

No decision was made until October when we were asked to provide a price for an alternate shower unit. On October 19, 2001 we forwarded cut sheets and a revised Change Order Request to furnish the showers only. Later that month we were asked to forward cut sheets and a revised price to furnish the specified units. This we did on November 1st and 2nd respectively.

At this same time we noticed that both showers had the same rough in for the shower drains and that five of the shower drains were overtop of a concrete beam below. This was discussed in a jobsite meeting on November 14, 2001 with the VA, and PBM. At that time they said they would need to review the problem in the field.

On November 20, 2001 we met with the VA and the engineer from Gipe Associates. This issue was discussed again and the engineer suggested researching whether the shower manufacturer could offset the drain. Subsequently the manufacturer said they could not do this.

Finally a decision was made to install a showers which did not need to sit in a recessed pit. And on December 13, 2001 we received a change order to furnish the shower units only. The showers were ordered on the same day on December 13, 2001. And delivered on Monday January 28, 2002. By February 20, 2002 only four shower units had been set in place. All the units were set complete by March 13, 2002. We could then connect our waste piping and install the trim inside the units. This was a delay of over six months, that caused us to do our work out of sequence and resulted in lost time. (Exhibit 10 Claim Book)

These four items had significant impact on the project. We could not start the installation without direction. The work starts at the bottom and works up. Without the answers we were prevented from working in a logical sequence. This forced us to demobilize in November when we did not have answers and could not proceed. When we restarted, we did one area and thought we would have the remaining information only to have to proceed on our own to prevent us from being closed out of walls.

In addition to the major delays outlined above the following issues additionally impacted the sequence of the job.

RFI letter dated August 22, 2001.  It took almost three months to receive any kind of answer to these questions.  The delay in these answers seriously impacted our work as detailed below.  (Exhibit 4 Claim Book)

Item #1 Existing floor and ceiling penetrations - were not able to be repaired until after walls had been built.  This work took longer to complete because it had to be done out of sequence.

Item #2 Air Induction units - we never received direction until January 16, 2002, almost 5 months later.  All the while having to work around these units in the performance of our work.

Item #4 Relocated waste and vent risers. On November 16, 2001 we were asked to provide the exact location of the risers in question.  We had already provided this information in our follow-up RFI #09 dated September 6, 2001.

We were then asked to provide a credit for the relocation of the waste and vent risers on December 14, 2001.  This was credited back to the VA on our Change Order Request 18 dated December 19, 2001 and a change order was not received until March 18, 2002.  This was a delay of seven months

This delay seriously hampered our efforts to schedule and complete the under floor and above floor waste and vent piping associated with tie-ins to these four riser groups.  We could not establish the elevations of the waste lines or complete the rough ins until the locations were determined.

RFI #02 Bedpan Washer submitted on June 6, 2001.  On October 11, 2001 we received from PBM, the VA's responses dated October 3, 2001.  The response partially answered the RFI but cut sheets were not provided.  The answers were late and incomplete delaying the rough in of the bedpan washers.  (Exhibit 2 Claim Book)

RFI #03 Nourishment Unit. submitted on June 6, 2001.  Though the answer (dated 10/03/01) referenced the details of the drawings, the detail did not have dimensions for installing the piping.  This was noted on our RFI #014 dated October 10, 2001.  At the jobsite meeting of November 28, 2001 we were told that the drain was centered on the units.

At the jobsite meeting on November 30, 2001 we were shown a unit that the VA was looking to purchase and the drain was not centered.  In fact, the

VA's decision on which unit to purchase was never known until a unit arrived on the jobsite in September 2002. The VA never forwarded cut sheets of the nourishment unit. In August 2002 we were continuing to install fixtures and the nourishment unit was not in place for us to hook-up. (Exhibit 3 Claim Book)

RFI #011 Plumbing Fixture P-528 Faucet - submitted on October 9, 2001 referenced a change made to a faucet on fixture P-528. This faucet was to be installed in a standard kitchen sink, which is not made for a faucet with 4" centers. This began another lengthy change order process, with our Change Order Request being forwarded to PBM on November 06, 2001 and though notification of acceptance was received on November 30, 2001, a written Change Order was not received until December 14, 2001. At this point the rough in of the project was well under way and it was during this time that we had to pull off the project due to lack of answers of which this was one. (Exhibit 6 Claim Book)

RFI #15 Relocated Water Cooler submitted on October 15, 2001 requesting information on the relocated water coolers. On November 30, 2001 we were given cut sheets on an Elkay water cooler to furnish. In the course of resolving this issue we submitted pricing on two different models of water coolers at the VA's direction. Finally, on Jan. 16, 2002, three months later, we received notice that the VA elected to purchase these units. And when we started installing fixtures in late June the water coolers were still not purchased. (Exhibit 7 Claim Book)

Plumbing submittal for Wade cast iron drains and carriers sent June 2, 2001and returned September 25, 2001 (96 days) prevented us from ordering the carriers. The lack of approval delayed release of the material for fabrication and delivery. These items had a long lead-time. We had to install the material out of sequence because of the late deliveries. (Exhibit 8 Claim Book)

We estimated that the installation of the waste and vent piping would take 492 hours over 4 weeks. The actual work for the waste and vent occurred from October 2001 to April 30, 2002. According to the certified payroll reports and daily logs we expended 1,903 hours of labor to complete this work. Due to the differing site conditions, lack of timely answers to our RFI's, delays and lack of approval of submittals, and lack of direction to the numerous change requests it took additional 1,411 hours to complete this work.

|  | Actual Hours | Estimated Hours | Change Order Hours | Total Est Hours | Overrun Hours |
|---|---|---|---|---|---|
| Waste + Vent | 1903 | 480 | 12 | 492 | 1,411 |

<u>Demobilize</u>                    <u>48 Hours</u>

We demobilized our work force due to the VA's failure to act on RFI's, submittals, and change order requests within a reasonable time on November 23, 2001. There was no work we could proceed with. And we had to remove our tools and equipment from the site. Everything was being held up waiting for direction. The time expended to demobilize was:

| <u>Employees</u> | <u>Hours</u> |
|---|---|
| Foreman | 8 |
| Mechanics | 16 |
| Sheet Metal Workers | 16 |
| Truck Driver | <u>8</u> |
| Total | 48 |

| | <u>Actual<br>Hours</u> | <u>Estimated<br>Hours</u> | <u>Change Order<br>Hours</u> | <u>Total Est<br>Hours</u> | <u>Overrun<br>Hours</u> |
|---|---|---|---|---|---|
| Demobilize | 48 | 0 | | 0 | 48 |

Exhibit D

<u>Fixtures</u>                    <u>193 Hours</u>

The installation of the fixtures was forced out of sequence by the differing site conditions, lack of timely answers to our RFI's, delays and lack of approval of submittals, and lack of direction to the numerous change requests from the VA. If this project had proceeded in a logical sequence we would have started installing the fixtures in one wing and proceed through the floor one room after another to complete the installation. We estimated that this would have been done in 182 hours. Exhibit E

Instead because the work was completed a room here then room there. We had to jump around to do the installation. Our time records indicate that we installed showers for one week in February and three days in March. Then because the problems with the waste system had not been resolved, the waste systems were not done, the finishes, consequentially, were not done so the fixtures could not be installed. We restarted installing the fixture in July. Even then we could not start and finish. We worked in one area, then moved to another problem then back to fixtures then back to something else. Instead of staying and finishing it completely.

All this out of sequence work cost additional time. We estimated that the fixture installation would take 182 hours. Due to the site conditions we spent 375 hours installing the fixtures. It took an additional 193 hours to complete this work.

| | Actual Hours | Estimated Hours | Change Order Hours | Total Est Hours | Overrun Hours |
|---|---|---|---|---|---|
| Fixtures | 375 | 174 | 8 | 182 | 193 |

## Medical Gas                              128 hours

We were unable to proceed with the installation of the medical gas system because of the VA's to failure to act on RFI's, submittals, and change order requests within a reasonable time.

This job was awarded in April 2001. The medical piping systems should have started at the beginning of the project. The issues that delayed the installation are outlined below. We could not start the installation of the system until March 5, 2002.

On June 26, 2001, we submitted the Amico Medical Gas equipment for approval. On July 31, 2001 we received a letter from PBM stating that the Amico equipment complies with the specifications but that the VA would like us to submit on a different manufacturer, Chemtron.

September 27, 2001 we submitted the Chemtron equipment cuts and a Change Order Request 10 for $1,825.00 for the increased costs associated with switching to a different manufacturer. We received the equipment approval on November 15, 2001.

But the change order request had not been approved and we could not proceed to order equipment. On January 4, 2002 PBM notified us that the VA had requested them to reduce the price considerably and that they had rejected their offer and were continuing negotiations.

After more than a month on February 8, 2002 we were notified that a unilateral was issued for this work and requesting further breakdown of our costs. Our reply on February 16, 2002 detailed our associated costs and included a copy of the quote from the supplier showing both the original price and the revised price.

On February 21, 2002 we received a partial Change Order of $1,365.25 for the amount the VA had approved and we were notified to proceed. Because we

had been direct to proceed via the unilateral, we ordered the equipment on February 28, 2002 without the Change Order being completely approved.

On March 4, 2002 we received a letter from PBM stating that the VA still disagreed with our price and "asserts that the cost would be significantly lower if purchased through… Manage Medical Systems". After notifying PBM in our fax of March 5, 2002 that we had already released the equipment, we sent the equipment list to Manage Medical Systems for a price quote. We received a quote back. The following day we forwarded a copy of the Manage Medical Systems quote with a price comparison to our supplier to the VA. Manage Medical Systems was $2,405.00 higher for the equipment alone.

On March 20, 2002 we asked if this information was reviewed and on April 19, 2002 we received the balance of the cost on PBM's Change Order 6b for $509.75.

All this changing and subsequent failure to process both the submittals and then the Change Order Request at the same time caused undue delay to a key critical path portion of the work. This work was an extensive part of our contract, which needed to be completed prior to the close in of the walls, and in careful sequence to assure the pipe remained clean. Because of the delays we had to work in pieces and out of sequence. This was a change that the VA had requested not C + D Contractors. (Exhibit 11 Claim Book)

RFI's #031 and 032- Missing medical gas outlet stations and remote alarm panel piping – On March 11, 2002 we requested additional direction on medical gas outlet stations not shown on the drawings. This question arose while we were installing the medical gas equipment and a timely response was critical.

On April 19 we received a response saying that the medical gas piping in this room was typical even though separate equipment was shown in every other room but not in this room. On April 22 we clarified our RFI to state that there was engineering and NFPA 99c issues to consider. We also noted the critical nature of this work and that the lack of clear answers was impacting and delaying our progress.

On April 23, we received answers to RFI # 031. The answer to part 2 was not possible to do because the equipment ordered was not configured to do remote alarm via DDC as requested. On April 25 we sent comments in reply to the RFI responses. On May 21, 2002 we forwarded our Change Order Request to add new stations to room 426. Subsequently, we were instructed to proceed by PBM. Again, in order to keep the job progressing we proceeded in good faith without a Change Order. (Exhibit 11 Claim Book)

The labor hour overruns are directly attributed to the delays in commencing the work and working out of sequence. There was no reason the submittals and

change orders could not have been processed in a timely manner. It took over seven months for the VA to review and approve the information on a twelve-month project. Attached is the schedule showing the dates information was submitted, the responses and when the work was completed. It does not make sense that during a twelve-month job the medical gas system that had to be installed in the walls prior to the drywall being hung could not start until the eleventh month of the project schedule.

We estimated the medical gas system would take 480 hours to install. Plus an additional 4 hours in change orders. The medical gas system took 612 hours to install; an overrun of 128 hours. Exhibit F

|  | Actual Hours | Estimated Hours | Change Order Hours | Total Est Hours | Overrun Hours |
|---|---|---|---|---|---|
| Medical Gas | 612 | 480 | 4 | 484 | 128 |

### Mechanical Room                    246 hours

The bid drawings were dated 7/24/00. On April 16, 2001 we were asked to price the revised set of drawings dated 11/10/00. The revised drawings consisted of changes to the piping, ductwork, mechanical equipment, and associated insulation. The bid documents with the addendum included a packaged Domestic Water Heater, a field fabricated HVAC Heat Exchanger and a Simplex Domestic Water Booster System. We submitted a price as Change Order Request 1 on April 30, 2001.

This began a series of re-pricing and revised change requests that still was not resolved sixteen months later. On May 10, 2001 we were forwarded letters from the VA dated May 4 and 10 asking for clarifications. We responded to all questions and provided additional breakdown of material costs. We did not receive any response to our answers. This change order was later voided by subsequent changes by the VA.

On June 13, 2001 we were faxed a set of sketches of two pieces of equipment from Armstrong Equipment which replaced the base bid equipment. The field fabricated HVAC Heat Exchanger was revised to a packaged Hot Water Heat Exchanger with 2 heat exchangers each. And the Domestic Water Booster System was also revised. The fax requested a credit for the VA to furnish this equipment. On June 21 we sent a letter to the PBM requesting additional information.

On June 25, 2001 the VA clarified the scope of work in response to our request of June 21. On July 12, 2001 we sent the credit as requested.

On August 1, 2001 we received a request to price purchasing and installation of the Armstrong equipment. On August 17, 2001 we responded with another price as requested. The change order request was for furnishing the Associated Steam Domestic and Heating Water Heaters, installing the equipment and a credit for the base bid material and equipment.

On September 13, 2001 we submitted Change Order Request 9 for the work outlined on the 11/10/00 drawings without the revised equipment from those drawings. The adds and deducts were similar to the April 30, 2001 Change Order Requests, except we made no changes to the equipment.

In addition on September 13, we summarized the changes we believed the VA was proceeding with related to these revisions. We also noted the delay that this was having on us proceeding on this portion of the work, which was a major component of the heating system and domestic water system.

When we first began the job we were told to construct the job according to the revised 11/10/00 drawings. We already had been doing the work related to the revised drawings for which we had not received a change order. Seven months later, November 28, 2001, we were requested by PMB to confirm our quotes for any changes in costs. "We have a received a letter from the VA requesting confirmation of the original quotes, supplied months ago. Please, verify your quotes and note any changes in cost."

We responded on December 7, 2001 with a summary of costs, based on C + D Contractors furnishing the equipment (as directed in the letter of 11/28/01), a request for 16 weeks time extension and notification that there would be a 5% increase if we did not receive a signed change order in 10 days.

On January 23, 2002 we notified PBM that after six weeks we still had not received the change order for the additional work and that the change order price was to be increased by 5% . And that we had proceeded with these revisions per the VA direction and we would include the additional work in our invoice.

On January 24, 2002 the VA again requested us to review our pricing for the VA to furnish Armstrong equipment. On January 24, 2002 we resubmitted that pricing with a 5% increase.

We were then informed that the VA had issued a unilateral to PBM for the Armstrong units at a significantly reduced price and that PBM had ordered them.

Over the winter and into the spring we repeatedly requested that this issue be resolved as it was seriously impacting the job. We did not know what had been ordered. What parts had been included in the order to Armstrong Equipment? Who would install what? What portions of our change request would be approved? We had to proceed with installation of the mechanical piping otherwise we would have been closed out of areas. The piping had to be installed and tested in sections because we did not have answers on the equipment and the associated piping. The following work could not be completed:

- Steam and condensate return
- Steam Mains and tie ins to existing
- Domestic Cold Water
- Heating Hot Water
- Testing of each system was done with out the equipment and now would have to be retested once each system was complete

The work would have to be done out of sequence and the completion date was slipping. At the meeting on May 23, 2002 when the completion date was extended to September 1, 2002, we made it clear to the VA that these issues still needed to be resolved. In our letter of June 6 we specfied the issues that need to be resolved:

"The following is the list of outstanding issues that need to be resolved for us to meet the September 1, 2002 completion date:

- RFI #024 Domestic Water tie-in to the existing 2" line
- Letter dated 5/9/02 regarding the steam condensate line relocation in exchange for the re-routing of the AHU floor drain.
- Heating Equipment layout and subsequent change order approval.
- Letter 5/3/02 regarding cleaning of the existing oxygen line.
- Change order approval of revised drawing 11/10/00 work without equipment revisions – this is needed prior to us proceeding with the steam line work.

These are critical path issues that need immediate attention and have been outstanding for many weeks. Because they have not been answered promptly, we are reserving our right to assess the impact of the delay caused by the lack of answers."

These issues sat dormant until the Armstrong equipment furnished by PBM arrived on site and we were again told the job had to be completed by September 1, 2002. Prior to that we had not received the cuts or any drawings on the installation of the systems even though we had requested this information several times.

The Domestic Booster System was not furnished as outlined in the quote from Associated Steam and the letter from the VA dated June 12, 2001. No drawings had been provided for the piping needed to connect to these Domestic Hot Water Heat Exchanger and Heating Hot Water Heat Exchangers. The pumps

have been shipped loose, instead of as a packaged unit as we were directed to price. The way the pumps are configured for installation would obstruct the access in the mechanical room. And no change order of any kind had been issued for this work or the revised drawing work. Because of that we told the VA that we would not proceed until we had a written change order.

We were then asked by the VA to revise our price again to complete the mechanical room with the Armstrong equipment provided and to make the necessary drawings of the piping with direction from the Armstrong supplier and the VA. This pricing, based on our sketch, was provided on June 28, 2002. We meet with the VA and revised the scope and resubmitted the proposal on July 9, 2002.

We were told on July 17, 2002 that a Change Order would be issued. On July 18 we received from PBM a copy of the VA's letters directing the work to be done and the markdown of our prices. Our prices were significantly cut. Our labor rate was reduced over 30%. The labor hours were revised to 190 hours.

We were directed by PBM to proceed with the work. We notified PBM on July 19, 2002 that we were proceeding under protest. We received a Change Order on July 22.

When we priced this revision, June 28,2002 and July 9, 2002, we needed additional information on Domestic Cold Water Booster System, expansion tanks, and insulation of piping and vessels on Armstrong Units. We were still waiting for the answers on August 1, 2002. It was four weeks to the completion date and we did not have the answers. We could not order or submit on the equipment. (Exhibit 19 Claim Book)

We had worked as directed on the 11/10/00 drawings since April 16, 2001. The design had been changed and revised. No decisions were made in a timely manner. No change orders were written. We were unable to invoice for the work.

We had been delayed from starting any work in a sequential manner. Every mechanical system was installed out of sequence. The mechanical room work was delayed until July 22 when we were directed to proceed with the revisions. Our Change Order Request had been significantly reduced with no explanation. We had to complete the work in six weeks and we were still waiting for clarification on items.

We started the installation of the equipment and piping in the mechanical room on July 24, 2002. It took 364 regular time hours and 72 overtime to install the systems. We expended 246 hours more than the arbitrarily reduced hours on the change order. Exhibit G

| | Actual Hours | Estimated Hours | Change Order Hours | Total Est Hours | Overrun Hours |
|---|---|---|---|---|---|
| Mechanical Rm | 436 | | 190 | 190 | 246 |

### Unscheduled Holiday                          60 Hours

We were working on January 21, 2002 on the plumbing systems and ductwork in the hallways. When we were asked to leave the site by the VA police because it was MLK Day. This was not a scheduled holiday per the specifications. Our employees had to leave and the delivery that we had unloaded on the dock had to picked up by our driver and returned to the warehouse. Exhibit H

| | Actual Hours | Estimated Hours | Change Order Hours | Total Est Hours | Overrun Hours |
|---|---|---|---|---|---|
| Unscheduled Holiday | 60 | | | 0 | 60 |

### Waste Exposure                          128 Hours

During the installation of the waste piping system, the new piping had to be tied in the existing plumbing drainage system. In order to make the tie in, the existing pipe is cut apart and the new fittings and pipe are inserted. The plumbing fixtures above the tie in point must not be used during this time. We scheduled the shutdowns with the VA through PBM. Exhibit I

On February 28, 2002 we were making a tie and the VA had coordinated the shutdown with the upper floor nursing staff. During the tie-in the toilet above was used. The toilet waste flushed onto our employees. The employees were on a ladder working though an access door and were unable to avoid the waste. Later in the same day we were continuing to make the tie in and the room above was suppose to be shutdown by the VA. Again the toilet was used splashing our employees. The room involved was an Isolation Room. The patient was HIV positive.

Needless to say our employees were extremely upset and worried. They were seen at the VA Emergency Room. In addition they were seen and treated at Occupational Health at Christiana Care. They were tested and treated for

exposure to blood borne pathogens.  Each employee had an initial visit to Occupational Health and several follow up visits and additional treatment.

On March 28 we had a shutdown of the waste stack in the ceiling of the Storage Room.  We had removed section of the stack and the existing fittings when someone emptied a bedpan into the toilet in the Soiled Utility Room on the sixth floor and flushed the toilet.  This was a locked room with a sign on the door not to use the fixture.  Again they were working on ladders through the ceiling and could not avoid the waste.  The employees had to leave for the day, as they were wet with sewage.

We expended 128 hours in medical visits and treatment for the exposures.

|  | Actual Hours | Estimated Hours | Change Order Hours | Total Est Hours | Overrun Hours |
|---|---|---|---|---|---|
| Waste Exposures | 128 |  |  |  | 128 |

Construction projects should be a carefully programmed sequence of work to accomplish the project within the contract time frame.  The delays and differing site conditions we encountered changed this sequence, resulting in delays in the completion of the contract and extra costs to us.  Our progress was repeatedly hindered by the owner's lack of timely response and direction.  If the information requested had been provided in a timely manner this project could have been done within the year schedule.  This was not a complex project.  It should have been completed within the one year time frame.

As illustrated these cumulative delays cost us an additional 2,532 hours to complete the project.

|  | Actual Hours | Estimated Hours | Change Order Hours | Total Estimated Hours | Overrun Hours |
|---|---|---|---|---|---|
| Demo | 475 | 157 |  | 157 | 318 |
| Waste + Vent | 1,903 | 480 | 12 | 492 | 1,411 |
| Demobilize | 48 | 0 |  | 0 | 48 |
| Fixtures | 375 | 174 | 8 | 182 | 193 |
| Medical Gas | 612 | 480 | 4 | 484 | 128 |
| Mechanical Room | 436 |  | 190 | 190 | 246 |
| Unscheduled Holiday | 60 |  |  | 0 | 60 |
| Waste Exposures | 128 |  |  | 0 | 128 |
| Mech + Dom Mains + Branches | 1,398 | 1,269 | 298 | 1,567 |  |
| Total | 5,435 | 2,560 | 512 | 3,072 | 2,532 |

As this claim has been pending since August 8, 2002. We would appreciate a timely review of this additional information. As we discussed on April 13 the VA will advise us within three days of the time needed to review this information and a proposed dates to meet and discuss the remaining issues.

Sincerely,

C + D Contractors, Inc.

Kathy Ryan



VA Medical Center
4th Floor West Renovation
Supplemental Information

Table of Contents

| Exhibit | Issue |
|---------|-------|
| A | Estimate and Schedules |
| B | Demolition |
| C | Waste and Vent |
| D | Demobilize |
| E | Fixtures |
| F | Medical Gas |
| G | Mechanical Room |
| H | Unscheduled Holiday |
| I | Waste Exposure |